

1538

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH DIVISION

UNITED STATES OF AMERICA )
*ex rel.* Graphite Electrode Sales, Inc. )
)
     Plaintiff, )
) Case No: **13 - 0474**
v. )
) **FILED UNDER SEAL**
AMERI-SOURCE HOLDINGS, ) **DO NOT PUT IN JURY BOX**
INC., AMERI-SOURCE SPECIALTY ) **DO NOT ENTER ON PACER**
PRODUCTS, AMERI-SOURCE )
INTERNATIONAL, INC., ) **DEMAND FOR JURY**
AMERI STEEL INC., )
SMC, INC., SPECIAL MACHINGING )
COMPANY, AMERI-SOURCE )
ENGINEERING INDIA PRIVATE LTD. )
TOM DIENER, and AJAY GOEL, )
)
     Defendants. )

### *QUI TAM* COMPLAINT

## TABLE OF CONTENTS

JURISDICTION AND VENUE ............................................................................3

PARTIES .........................................................................................................4

BACKGROUND ................................................................................................7

      THE INDUSTRY ........................................................................................7

      ANTIDUMPING DUTIES ..........................................................................10

      UKCG AND SUBSTANTIAL TRANSFORMATION .....................................13

      THE FALSE CLAIMS ACT .......................................................................15

DEFENDANT'S FRAUDULENT SCHEMES .........................................................16

    I.      Shipping Documents Implicate that Ameri-Source Affiliates
            Shipped Chinese Graphite to the United States via India .......................16

    II.    Ameri-Source Small Diameter Graphite Electrode Pricing
            Implicates Chinese Origin ................................................................20

    III.   Eyewitness Accounts Implicate Chinese Origin ...................................21

    IV.   A Survey of Asian Synthetic Graphite Manufacturers Implicates
            Chinese Origin of Ameri-Source Imports ...........................................23

            A. The Only Two Indian Small Diameter Graphite Electrode
               Manufacturers Deny Supplying Ameri-Source in Direct
               Contradiction to Ameri-Source's Representations ...........................23

            B. There Are No Known South Korean Manufacturers of
               Synthetic Graphite .....................................................................25

    V.    Ameri-Source's Scheme Damages the United States and
            Violates the Purpose of the Anti-Dumping Law by Giving
            An Unfair Advantage Over Other Importers .......................................26

COUNT I – VIOLATION OF 31 U.S.C. §3729(a)(1)(G) ...........................................26

COUNT II – VIOLATION OF 31 U.S.C. §3729(a)(1)(C) ..........................................29

Plaintiff-Relator Graphite Electrode Sales, Inc. ("GES"), on behalf of itself and the United States of America, alleges and claims against Defendant Ameri-Source Holdings, Inc. and its affiliates, Ameri-Source Specialty Products, Ameri-Source International, Inc., Ameri Steel Inc., SMC, Inc., Special Machining Company, Tom Diener, and Ajay Goel (collectively "Ameri-Source"), as follows:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act" or "FCA").  Specifically, this action alleges a scheme whereby Ameri-Source knowingly avoided obligations to pay antidumping duties to the United States – in violation of, *inter alia*, 19 U.S.C. § 1673, 74 Fed. Reg. 8775 (February 26, 2009), and 77 Fed. Reg. 13284 (March 6, 2012) – (i) by falsely declaring India or South  Korea as the country-of-origin of graphite rods or electrodes, which originated from the People's Republic of China (China), imported into the United States, and (ii) falsely classifying graphite electrodes imported from China on U.S. Customs and Border Protection entry documents as graphite rods under tariff classification code ("HTS Code") 3801.10.1000 of the Harmonized Tariff Schedule of the United States (HTS) (not subject to import duties) rather than as graphite  electrodes under HTS Code 8545.11.0010 (subject to import duties).  Such false designation is a material violation of Ameri-Source's responsibility under 19 U.S.C. § 1484 to use reasonable care in providing information regarding Ameri-Source's imports to the United States for the purpose of properly assessing duties on the merchandise.  Ameri-Source's conduct implicates the "reverse false claim" prohibition of the False Claims Act in that Ameri-Source knowingly used (or causing to be used) false records or statements to conceal, avoid, or decrease its obligation to pay money to the federal government. 31 U.S.C. § 3729(a)(1)(G).

2.      Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

3.      Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in this state, transact substantial business in this judicial District, and can be found here.

## PARTIES

4.      Ameri-Source Holdings, Inc. ("Holdings") is a Pennsylvania corporation with a registered address of 5372 Enterprise Boulevard, Bethel Park, Pennsylvania 15102.    The registered officers are Tom Diener (President) and Ajay Goel (Vice President).

5.      Ameri-Source Specialty Products ("Specialty") is a Pennsylvania corporation specializing in the manufacture of specialized engineering graphite and metal items for a variety of industries with a registered address of 5372 Enterprise Boulevard, Bethel Park, Pennsylvania 15102.    The registered officers are Tom Diener (President) and Ajay Goel (Vice President). Specialty operates warehouses in various locations including Pittsburgh, Pennsylvania; Port Elizabeth, New Jersey; Long Beach, California and other "tactical locations near the client base for just-in-time deliveries and efficient logistics." Specialty is an ISO 9001:2008 registered/certified company.

6.      Ameri-Source International, Inc. ("International") is a Delaware corporation, licensed to do business in Pennsylvania with a registered address of 300 Mount Lebanon Boulevard, Suite 239, Pittsburgh, Pennsylvania 15234.  The registered officers are Tom Diener (President) and Ajay Goel (Vice President), both of whom gave the address of 5372 Enterprise Boulevard, Bethel Park, Pennsylvania 15102 in registering the company.  International also uses the Enterprise Boulevard address as its mailing address.

7.     Ameri Steel, Inc. ("AmeriSteel") is an unregistered entity and apparent alias of or d/b/a of Ajay Goel located at both 2401 Old Washington Road, Pittsburgh, Pennsylvania 15241 and 128 Lamplighter Lane, McMurray Pennsylvania 15317.   Shipping records provide that AmeriSteel has used each address as consignee or notifying party for shipments of graphite.  Both of these addresses are residential and owned by Ajay Goel and his wife, Poonam B. Goel.

8.     SMC, Inc. ("SMC") is an entity of unknown organizational status, apparently unregistered and operating as an alias of or d/b/a for Ajay Goel.  SMC has been identified on shipping records as having the address 128 Lamplighter Lane, McMurray, Pennsylvania 15317, which is Ajay Goel's home address.

9.     Upon information and belief, Special Machining Company ("Special Machining") is a business entity maintaining its principal place of business in Mumbai, India, although it is not registered to do business in India.  It is located at C-403 TTC, MIDC Turbhe, Navi Mumbai, 400705, India.  A certificate issued by the Federation of Indian Export Organizations (FIEO) provides that Special Machining is a partnership with a contact person by the name of Neena Goel and phone number of 91-22-27614101.

10.    Ameri-Source Engineering India Private Ltd. ("Engineering") is a private limited company incorporated in the state of Maharashtra, India.  The original shareholders include Ajay Goel, Tom Diener, and Amit Jain.  The original registered address was Amit Jain's residential address at 803A, Sadguru Complex, Film City, Goregaon East, Maharashtra 400063.  The next available address is 16/17 Highway Commerce Center, I B, Patel Road, Goregaon East, Mumbai 400063.  The current address is E-1/704 Bhimashankar, Nerul, Navi Mumbai, Maharashtra 400706, the personal address of Vilas Bhamre, a current shareholder and director of Engineering. Engineering has reported an additional address of C-403 TTC, MIDC Turbhe, Navi Mumbai

400705, the same address as Special Machining Company.   Engineering's FIEO certificate provides the same contact information as Special Machining Company's FIEO certificate.  Amit Jain has a Specialty domain email address (@ameri-source.com) and lists as Engineering's website the same website as Specialty (www.ameri-source.com).

11.     Tom Diener is an individual with a known ownership interest in Holdings, Specialty, International and Engineering.  Tom Diener resides in Pennsylvania.

12.     Ajay Goel is an individual with an ownership interest in Holdings, Specialty, International and Engineering.  Ajay Goel resides in Pennsylvania at 128 Lamplighter Lane, McMurray, Pennsylvania 15317.  This address is also the address of AmeriSteel and SMC.

13.     Plaintiff-Relator GES is a domestic corporation headquartered in Birmingham, Alabama.  GES is the largest importer of small diameter graphite electrodes and specialty products (including graphite rods) in the United States, with more than twenty-five years of experience in the synthetic graphite industry.  In this capacity, GES is acutely aware of the volume and source of origin of a substantial portion of the world-wide shipments of small diameter graphite electrodes and graphite rods, particularly with respect to U.S. imports.  GES will voluntarily disclose to the Government the information upon which this action is based.  To the extent that any public disclosure has taken place as defined by 31 U.S.C. § 3739(e)(4)(A), GES is the original source of the information for purposes of that section.  Alternatively, GES has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and GES will voluntarily provide that information to the Government shortly after filing this Complaint. GES will be serving a statement of the material evidence in its possession upon which its claims are based upon the Government pursuant to 31 U.S.C. § 3730(b)(2).

## BACKGROUND

### The Industry

14.     There are two types of graphite used in various industries worldwide.  Natural graphite is mined for use in batteries, steelmaking, brake linings, foundry facings and lubricants. Artificial or synthetic graphite is manufactured to make graphite electrodes that are used in steel production and foundry applications.  Producing synthetic graphite requires expensive, highly advanced technology that is held by relatively few companies worldwide.  This complaint focuses on synthetic graphite.

15.     There are two primary technologies for steel making: electric arc furnace steel production (also called "mini-mill production") and basic oxygen furnace steel production (also called "integrated steel production").  Electric arc furnace (EAF) steel production uses heat generated by electricity to melt raw materials, primarily scrap metal, and refine it into steel. Large diameter graphite electrodes – typically 18 to 32 inches in diameter – are generally used in EAF steel production because of their size and strength.  The production process involves forcing the large diameter graphite electrodes down into a furnace filled with scrap metal or other source material.  Small diameter graphite electrodes – typically 3 to 16 inches in diameter – are generally used in smaller ladle furnaces for refining steel and to re-melt steel in foundries, but are also used in EAF steel production in specific situations.

16.     Graphite electrodes are large columns of virtually pure synthetic graphite used in electric arc furnaces.   The manufacturing process required to produce synthetic graphite electrodes generally takes several months and includes (i) blending pulverized petroleum coke and binder materials, (ii) extruding the powder mixture into the desired shape (rod, bar, die molding), (iii) carbonizing the extruded materials in a baking furnace at temperatures from 1840

to 2200 degrees Fahrenheit, and (iv) graphitizing the carbon electrodes by baking at temperatures between 4530 and 5430 degrees Fahrenheit. Graphite electrodes are usually shipped "finished" from the supplier, meaning that the ends have been machined to accommodate the graphite connecting pins (also called "nipples") that connect the electrodes together to make the large graphite electrode columns used in arc furnace and ladle furnace applications. However, graphite electrodes are sometimes shipped "unfinished" meaning that a small amount of machining is required upon arrival in the United States in order for the graphite electrode to be suitable for the particular furnace or application. Machining imported graphite electrodes in the United States adds additional costs for transportation and machine shop work, thus limiting domestic machining to those specialized situations where the market will support such additional costs.

17.    EAF steel production requires temperatures as high as 5000 degrees Fahrenheit to melt scrap metal or other raw materials and refine them into steel. The heat is provided as electricity passes through the graphite electrodes and creates an electric arc. The primary furnace in an EAF typically uses three columns of large diameter graphite electrodes at one time. Each column typically consists of three large diameter graphite electrodes joined together by graphite connecting pins. On average, one of the nine graphite electrodes is fully consumed every 8 to 10 operating hours as it is plunged into the scrap metal or other source material utilized in the steel production process.

18.    The trend in electric arc furnace operation is to design EAF's to use higher levels of electricity, which necessitates the use of larger diameter electrodes. The larger the diameter of the electrode, the more electricity it is able to conduct. The majority of graphite electrodes sold for primary EAF applications are 24 inches in diameter or greater.

19.     In contrast, ladle furnaces, which do not melt scrap metal but rather keep the product in molten form as it continues through the production process, typically use smaller diameter graphite electrodes that have a lower current carrying capacity.  These small diameter graphite electrodes do not need to be of the highest quality because the small diameter graphite electrodes used in ladle furnaces generally do not need to generate the same intense heat as the large diameter graphite electrodes utilized in the primary melting process.

20.     The large diameter graphite electrodes utilized in a primary electric arc furnace are typically supplied by one of the large international electrode manufacturers such as SGL Carbon SE, GrafTech International Ltd., Showa Denko Carbon, Inc. or Tokai Carbon Co., Ltd. Superior Graphite Co. is the only manufacturer that produces small diameter graphite electrodes in a range of sizes within the United States.  SGL Carbon manufactures large diameter graphite electrodes in the United States in a number of different sizes, but only produces small diameter graphite electrodes with a 16 inch diameter domestically.  The majority of small diameter graphite electrodes used in ladle furnace and foundry applications in the United States are imported by companies like GES or Ameri-Source from foreign manufacturers.

21.     The majority of the global supply of small diameter graphite electrodes is produced in Russia, the former Soviet states (primarily Romania and the Ukraine), China, and India.  During the Cold War these nations were fairly isolated and were forced to produce their own synthetic graphite for steel production and other industrial uses.  Since graphite electrode production requires very expensive and highly advanced technology, the manufacturers in these nations partnered with global companies such as SGL Carbon SE, Union Carbide, and a few Japanese companies in order to acquire the requisite technology for production.

22.     As of 2008, one-hundred twenty five companies have been identified by the United States International Trade Commission as either producers or exporters of small diameter graphite electrodes in China. However outside of China, there are a very limited number of companies producing small diameter graphite electrodes for import into the United States by companies like GES or Ameri-Source. Those companies include: HEG Ltd. (India); Graphite India Ltd. (India); Ukrainsky Grafit Company (Ukraine); Electrocarbon SA (Romania); and Energoprom Group (Russia), all of which are known to or are established business partners of GES.

## Antidumping Duties

23.     The HTS is published by the Office of Tariff Affairs and Trade Agreements of the United States International Trade Commission.   The HTS provides the applicable tariff rates and statistical categories for all merchandise imported into the United States and is based on the international Harmonized System, the global system of nomenclature that is used to describe most world trade in goods.  United States Customs and Border Protection (CBP) is the only agency that can provide legally binding advice or rulings on classification of imports.

24.     "Dumping" is defined as the sale of a commodity in an export market at a price less than "normal value" or "fair value."  Normal value is based either on the price of the same or a similar product in a comparison market or on "constructed value," the cost to produce the product plus some amount for profit.  The extent of dumping is called the "dumping margin," which is calculated by subtracting the export price from normal value and dividing the difference by the export price.

25.     For antidumping duties to be imposed on a particular good, the authorities must determine that dumping exists and that the domestic industry is materially injured or threatened

with material injury, or that the development of an industry is materially retarded, by reason of dumped imports. Antidumping orders are generally issued with respect to one or more classes.

26.     An industry can seek relief under the antidumping law by filing a petition with the International Trade Commission (ITC) and the U.S. Department of Commerce (Commerce). Once an antidumping investigation is initiated, the ITC has 45 days to determine whether there is reason to believe that dumped imports are causing or threatening to cause injury to a domestic industry.  Following an affirmative preliminary finding, Commerce issues questionnaires to "mandatory respondents."  If the "mandatory respondents" wish to continue business in the United States they must respond to Commerce's requests for information.  Commerce normally makes its preliminary determination within 140 days of the investigation's initiation and its final determination within 75 days of the preliminary determination.  Once Commerce issues its final determination, the ITC normally has 45 days to make its final injury finding.  If that determination is affirmative, an antidumping order is issued, which subjects prospective imports to antidumping duty deposits equal to the calculated rate of dumping.

27.     On January 17, 2008, SGL Carbon LLC and Superior Graphite Co. (the "Petitioners") filed a petition with Commerce alleging that imports of small diameter graphite electrodes from China were being or likely to be sold in the United States at less than fair value and that such imports were materially injuring, or threatening material injury to, an industry in the United States.  The Petitioners sought to have Commerce impose antidumping duties on small diameter graphite electrodes from China pursuant to 19 U.S.C. §1673(b).

28.     On February 6, 2008, Commerce initiated an investigation of small diameter graphite electrodes of any length, whether or not finished, of a kind used in furnaces, with a nominal or actual diameter of 400 millimeters (approximately 16 inches) or less from China.

Small diameter graphite electrodes are classified for tariff purposes under HTS Code 8545.11.0000. 73 Fed. Reg. 8287 (February 13, 2008).

29.     On January 14, 2009 Commerce announced its affirmative final determination in the antidumping duty investigation of imports of small diameter graphite electrodes from China pursuant to 19 U.S.C. § 1673(d). 74 Fed. Reg. 2049 (January 14, 2009).

30.     Commerce determined that Chinese producers/exporters have sold graphite electrodes in the United States at 132.90 to 159.64 percent less than normal value.

31.     On February 19, 2009, the ITC notified Commerce of its final determination that an industry in the United States is being materially injured by reason of less-than-fair-value imports of subject merchandise from China, and Commerce responded by issuing an antidumping order, "Antidumping Duty Order: Small Diameter Graphite Electrodes from the People's Republic of China" (the "Order"). 74 Fed. Reg. 8775 (February 26, 2009).  The Order provided that Commerce would direct CBP to assess antidumping duties equal to the amount by which the normal value of the merchandise exceeds the export price of the merchandise for all relevant entries of small diameter graphite electrodes from China.  The Order further provided that effective on February 26, 2009, CBP will require, at the same time the importers would normally deposit estimated duties on this merchandise, a cash deposit equal to the estimated weighted-average antidumping duty margins listed, ranging from 132.90 to 159.64 percent.

32.     Pursuant to 19 U.S.C. § 1484, the "importer of record" is responsible for using reasonable care to provide CBP with sufficient information, including declared value, classification, and rate of duty, to enable CBP to properly assess duties, collect accurate statistics, and determine whether other applicable legal requirements, if any, have been met.  CBP is then responsible for fixing the final classification and value of the merchandise.  An importer of

record's failure to exercise due care could delay the release of the imports and, in some cases, may result in the imposition of penalties.

33.     CBP is responsible for assessing all customs duties and penalties.

34.     In doing so, CBP necessarily relies upon the country-of-origin and HTS Code information that must be reflected on: (a) the CBP Form 7501 accompanying every import into the United States intended for domestic consumption; and (b) markings on the product itself.

35.     On March 11, 2011, Commerce commenced an administrative review of the Order, 76 Fed. Reg. 17825 (March 31, 2011), ultimately determining that below market sales were continuing to occur and the antidumping duties would remain in place. 77 Fed. Reg. 13284 (March 6, 2012).

36.     As detailed herein, Ameri-Source has wrongfully avoided paying millions of dollars in customs duties and attendant penalties, and continues to wrongfully avoid paying these duties and penalties, by knowingly making, or causing to be made, materially false country-of-origin and HTS Code designations on the CBP Form 7501 and/or the packaging for imports of unfinished small diameter graphite electrodes from China.

### UKCG and Substantial Transformation

37.     The U.S. Rules of Origin are explained in the CBP Informed Compliance Publication of May 2004.  The Non-Preferential Rules of origin provide in part:

> All U.S. non-preferential rules of origin schemes employ the "wholly obtained" criterion for goods that are wholly the growth, product, or manufacture of a particular country.  On the other hand, all U.S. non-preferential rules of origin schemes employ the "substantial transformation" criterion for goods that consist in whole or in part of materials from more than one country.  In the majority of the non-preferential schemes, the substantial transformation criterion is applied on a case-by-case basis, and it is based on a change in name/character/use method (i.e., an article that consists in whole or in part from more than one country is a product of the country in which it has been substantially transformed into a new

and different article of commerce with a name, character, and use distinct from that of the article or articles from which it was so transformed.)

38.     The Order on small diameter graphite electrodes from China covers "all small diameter graphite electrodes of any length, whether or not finished, of a kind used in furnaces, with a nominal or actual diameter of 400 millimeters (16 inches) or less, and whether or not attached to a graphite pin joining system or any other type of joining system or hardware." 74 Fed. Reg. 8775 (February 26, 2009).  It also covers graphite pin joining systems for small diameter graphite electrodes.  The small diameter graphite electrodes covered by the Order are classified under the HTS Code subheading 8545.11.0000 for convenience and customs purposes, but the "written description of the scope is dispositive." 74 Fed. Reg. 8775 (February 26, 2009).

39.     On July 31, 2012, Commerce issued a final determination in another circumvention investigation (against U.K. Carbon & Graphite Co., Ltd. (UKCG)) that small diameter graphite electrodes finished by UKCG from Chinese-produced graphite rods and unfinished small diameter graphite electrodes component inputs were exported to the United States in circumvention of the Order.  Commerce noted that the totality of the sourcing and procurement information, in addition to the corresponding sales documentation, demonstrated that the inputs were produced in China.  Commerce made this finding despite the fact that the inputs were not necessarily small diameter graphite electrodes when exported from China, but were machined or completed in the United Kingdom before shipment to the United States.  77 Fed. Reg. 47596 (August 9, 2012).

40.     Therefore, unfinished electrodes, whether they are called a rod, bar or round, and regardless of tariff classification, are covered by the scope of the antidumping order, and substantial transformation of graphite rods to small diameter graphite electrodes is irrelevant.

## False Claims Act

41.     The False Claims Act (FCA) was enacted during the Civil War to impose liability on persons and companies who defraud the federal government.  The FCA contains a "qui tam" provision that allows a private individual, not affiliated with the federal government, to bring suit on behalf of the government.  The FCA imposes liability when any person or entity improperly receives payment from or avoids payment to the federal government.  Among other things, the FCA prohibits persons from knowingly using (or causing to be used) a false record or statement to conceal, avoid, or decrease an obligation to pay money or transmit property to the federal government and conspiring to do the same.  31 U.S.C. § 3729(a)(1)(G) and 31 U.S.C. § 3729(a)(1)(C).  Conduct implicating these prohibitions of the False Claims Act is commonly referred to as a "reverse false claim."

42.     The reverse false claim provision and the corresponding conspiracy provision of the False Claims Act have proven to be an appropriate and effective method of policing false designation of country of origin and HTS Code, and enforcing payment of antidumping duties and penalties. *See, e.g., U.S. ex rel. Dickson v. Toyo Ink Manufacturing Co., Ltd., et al*, No. 09-CV-438 (W.D.N.C.). (United States alleged that defendant violated 31 U.S.C. § 3729(a)(1)(C) and 31 U.S.C.§ 3729(a)(1)(G) by falsifying the country-of-origin on documents given to CBP for over eight years on the imports of colorant carbazole violet pigment number 23 (CVP-23), resulting in $45 million, plus interest, settlement in the government's favor in December 2012).

## DEFENDANT'S FRAUDULENT SCHEMES

43.     Ameri-Source has wrongfully avoided paying millions of dollars in customs duties and attendant penalties, and continues to wrongfully avoid paying these duties and penalties, by knowingly making, or causing to be made, materially false country-of-origin and HTS Code designations on the CBP Form 7501 and/or the packaging for imports of small diameter graphite electrodes from China.

## I.     Shipping documents implicate that Ameri-Source affiliates shipped Chinese graphite to the United States via India.

44.     Shipping manifests show that since March 31, 2010, large quantities of Chinese graphite rods were imported by Special Machining into Jawaharlal Nehru Port Trust (JNPT) in Mumbai, India for "jobwork" and re-exportation.

45.     For example, on May 31, 2010 Special Machining imported from China 19,973 KG (or 20.0 MTS) of graphite rods for "job work and re-exportation."  There were 16 shipments made in 2010, 25 shipments made in 2011, and at least 10 shipments made in the first nine months of 2012.

46.     However, Special Machining is little more than a shell company, set up by Ameri-Source merely to house graphite rods and unfinished graphite electrodes of Chinese origin before shipping the materials into the United States., thus circumventing the Order and avoiding the customs duties and penalties due on Chinese small diameter graphite electrodes.

47.     On October 19, 2012, after visiting Special Machining's facility in Mumbai, India, LSR Services, Ltd., an international due diligence and investigative firm, confirmed to GES that this facility was only a dilapidated warehouse and not an actual graphite manufacturer. Further, the facility is not capable of any significant job work and is likely too small to load or

unload an international shipping container of the type normally used to transport small diameter graphite electrodes and other graphite products.

48.     The address used by Special Machining on its application for a certificate from the Federation of Indian Export Organizations and on customs records is the same address reported for Engineering.  Engineering was formed by Ajay Goel, Tom Diener, and Amit Jain. Ajay Goel and Tom Diener are the owners and officers of Specialty, a U.S. affiliate of Ameri-Source that imports graphite rods from Special Machining.

49.     The Port Import/Export Reporting Service (PIERS) database is a highly regarded industry reference containing import data compiled from bills of lading for substantially all waterborne cargo vessels that enter and exit the United States.  The information is sourced from CBP and supplemented by additional data compiled by PIERS staff members.

50.     The PIERS data for imports of graphite rods shows the dates and quantities of graphite rods imported by Ameri-Source into the U.S., clearly showing that Ameri-Source and its U.S. affiliates imported large quantities of graphite rods and unfinished graphite electrodes from 2009 to 2012, primarily (i) from China through India by Special Machining, (ii) from China through South Korea, and (iii) directly from China into the United States, in each case falsely utilizing HTS Code 3801.10.1000 rather than 8545.11.0010 in order to obfuscate the actual use to which the imported unfinished graphite electrodes would be put in the United States (and, thus, avoiding antidumping duties).

51.     For example, on May 25, 2010, Specialty imported 22,942 kg of graphite rods from Special Machining.  Specialty imported another 19,973 kg from Special Machining on June 5, 2010.  Accordingly, in total, Ameri-Source and its U.S. affiliates imported some 227,445 kg of graphite rods from Special Machining in 2010.

52.     On January 3, 2011, Ameri-Source imported 38,712 kg of graphite rods from Special Machining.  On July 11, 2011 SMC, Inc. imported 54,690 kg of graphite rods from Special Machining.  After August 2011, Ameri-Source apparently began to limit certain U.S. Customs information relating to its imports (a service that is available for a fee), thus masking the amount of imports after that date.  Regardless, Ameri-Source and its affiliates imported at least 695,585 kg of graphite rods from Special Machining in 2011 (plus its unreported post-August 2011 imports).

53.     Based upon publicly available import data from PIERS and other sources, Ameri-Source appears to have imported at least 4,008 MT of graphite rods and unfinished graphite electrodes from 2008 to 2012.  The first table below shows total Ameri-Source imports during the measurement period, and the second table shows which of the total imports are attributed to Ameri-Source by specific reference ("marked" imports) and which of the total imports are attributed to Ameri-Source indirectly ("unmarked" imports), based on information included in the shipping records known to be associated with Ameri-Source or its affiliates.

| Ameri-Source Rod Imports *(includes unmarked)* | | | | | |
|---|---|---|---|---|---|
| Metric Tons (MT) | | | | | 2009-2012 |
| | **2008** | **2009** | **2010** | **2011** | **YTD 12** | **TOTAL** |
| China | 0 | 20 | 320 | 315 | 525 | **1,180** |
| India | 0 | 0 | 389 | 1,215 | 762 | **2,366** |
| Korea | 22 | 320 | 54 | 66 | 22 | **462** |
| **Total Rods** | **22** | **340** | **763** | **1,596** | **1,309** | **4,008** |
| *- Containers per qtr* | *0* | *4* | *10* | *20* | *17* | |

| Marked & Unmarked Rod Imports | | | | | | |
|---|---|---|---|---|---|---|
| Metric Tons (MT) | marked | unmarked | marked | unmarked | marked | unmarked |
| | **2010** | **2010** | **2011** | **2011** | **YTD 12** | **YTD 12** |
| China | 320 | 0 | 315 | 0 | 378 | 147 |
| India | 367 | 22 | 735 | 480 | 77 | 685 |
| Korea | 54 | 0 | 66 | 0 | 0 | 22 |
| **Total Rods** | **741** | **22** | **1,116** | **480** | **455** | **854** |
| Note A: Marked = import record includes reference to Ameri-Source | | | | | | |
| Note B: Unmarked = import record appears to be Ameri-Source | | | | | | |

54.    Ameri-Source receives imported unfinished graphite electrodes at its warehouse locations in the United States and transports the unfinished graphite electrodes to various domestic machine shops, where the unfinished electrodes are then machined into finished graphite electrodes by preparing them to accept a machine-threaded connecting pin. Ameri-Source then sells the finished graphite electrodes to U.S. customers at rates substantially below the market rate for non-Chinese small diameter graphite electrodes.

55.    The Order covers all small diameter graphite electrodes, whether finished or unfinished. As directly provided in the Order, the descriptive scope is controlling over the HTS Code classification of the rods. Further, the UKCG decision provides that simply machining rods from China into electrodes in another country in an attempt to change the country-of-origin is a violation of the Order, as the rods remain of Chinese origin. Thus, the Ameri-Source description of unfinished small diameter graphite electrode imports as "graphite rods" under HTS Code classification 3801.10.1000, rather than as "unfinished graphite electrodes" under HTS Code classification 8545.11.0010, is misleading and circumvents the Order. This misclassification is in direct violation of 19 U.S.C. §1484.

## II.   Ameri-Source Small Diameter Graphite Electrode Pricing Implicates Chinese Origin

56.    Beginning in 2010, GES and other graphite importers began to lose significant small diameter graphite electrode customers to Ameri-Source based on what was described by customers as "Indian" graphite electrodes purchased from Ameri-Source at prices significantly below the prevailing market price for non-Chinese small diameter graphite electrodes.

57.    The market price for small diameter graphite electrodes in the United States today is approximately $2.25 per pound.  Ameri-Source was, and continues, to take business away from legitimate market participants by offering small diameter graphite electrodes at $1.85 per pound and purportedly telling customers that the country of origin is India, South Korea or the Ukraine.

58.    GES, as one of the nation's primary importers of graphite electrodes, is knowledgeable of the volume and source of origin of substantially all of the world-wide shipments of small diameter graphite electrodes and graphite rods, particularly with respect to U.S. imports.  Based upon its long-standing position in the industry and unique knowledge of and relationships with the limited number of manufacturers world-wide that serve the small diameter graphite electrodes market, GES represents that there are no legitimate suppliers that are capable of marketing electrodes at $1.85 per pound to customers in the United States, other than Chinese manufacturers.  In fact, such vastly reduced pricing corresponds more readily to the findings of Commerce regarding the pricing of dumped Chinese-produced small diameter graphite electrodes at more than twice the normal value. *See* 74 Fed. Reg. 2049 (January 14, 2009).

59.    During this same period, GES also began to notice significant increases in graphite rod imports into the United States.  Before January 2009, there were, on average, two

(2) containers of electrode-grade graphite rods imported into the United States, per quarter. Now, there are over twenty (20) containers of electrode-grade graphite rods imported, per quarter.

60.     Ameri-Source continues to offer small diameter graphite electrodes for sale in the United States at dumped price levels that could only be sourced profitably from China.  As recently as 2012 an Ameri-Source sales representative quoted pricing on purportedly Indian-sourced small diameter graphite electrodes at prices more than 25% less than the price offered by GES or other U.S. suppliers according to the purchasing manager at Akers, a GES customer.  As noted below, both of the Indian manufacturers of small diameter graphite electrodes have confirmed that they do not sell or distribute small diameter graphite electrodes through Ameri-Source in the United States.

### III.     Eyewitness Accounts Implicate Chinese Origin

61.     In July 2011, GES obtained photographs of graphite electrodes and rods stored at or near Ameri-Source's facility in Bethel Park, Pennsylvania.  The photographs clearly displayed stored electrodes or rods on the Ameri-Source property.

62.     GES's warehouse manager and crew analyzed the photos and made the following observations: (1) the electrodes or rods appear to be 14 to 16 inches in diameter; (2) the electrodes or rods are packaged with Styrofoam end-caps (in GES's experience, only HEG and the Chinese ship with Styrofoam end caps)), (3) the wood packaging and method of securing appears consistent with that used by Chinese producers, and (4) the labels on the packaging are similar in size and placement as those used by Chinese producers.  Based upon their observations, the warehouse manager and crew determined that the stored electrodes or rods were Chinese in origin and were 14 to 16 inches in diameter.

63.     In late July 2011, GES's sales manager, George Shaheen, took additional photographs of the Ameri-Source facility in Bethel Park, Pennsylvania.  The photographs show the following: (1) stacks of 18 inch Chinese electrodes hiding smaller Chinese electrodes (14 or 16 inches), (2) labels of the smaller electrodes showing the they were routed through India by Special Machining, (3) smaller diameter electrodes with pre-set connecting pins with Ameri-Source packaging but no indication of country of origin (likely machined in the United States), and (4) significant storage of graphite rods behind the warehouse at the location.

64.     In mid-September 2011, two GES sales representatives visited Ervin Industries ("Ervin"), a former client in Butler, Pennsylvania, to discuss its electrode needs.  A representative of Ervin confirmed that Ervin was purchasing graphite electrodes from two sources at the time: (1) Graphite Sales, which provides electrodes from Graphite India through their exclusive representation relationship, and (2) Ameri-Source.  Graphite Sales' electrodes were clearly labeled as "Graphite India," with metal tags, specification sheets and Graphite India stickers on the product.  The Ameri-Source electrodes were stripped of all identifying markings except for a small white "Made in India" sticker on the ends.  There was no indication of the manufacturer or specifications that would normally accompany Indian-sourced electrodes.

65.     On August 1, 2012, Hunter Kearney, an employee of GES, took photographs of the Ameri-Source storage yard near Pittsburgh, Pennsylvania, which showed the storage of significant quantities of graphite rods imported from India by SMC, Inc.  However, as described below, all of the Indian suppliers of small diameter graphite electrodes deny supplying Ameri-Source.

IV.   **A Survey of Asian Synthetic Graphite Manufacturers Implicates Chinese Origin of Ameri-Source Imports**

A.   **The Only Two Indian Small Diameter Graphite Electrode Manufacturers Deny Supplying Ameri-Source in Direct Contradiction to Ameri-Source's Representations**

66.    Import data, including bills of lading and PIERS data for imports of graphite rods from India, show Ameri-Source importing graphite rods from an Indian supplier identified as "Special Machining."

67.    However, Special Machining is little more than a shell company set up by Ameri-Source merely to house graphite rods and electrodes of Chinese origin before shipping the materials into the United States, thus circumventing the Order and avoiding the customs duties and penalties due on Chinese graphite rods and electrodes.

68.    In fact, there are only two manufacturers of graphite electrodes and rods located within India: HEG, Ltd. and Graphite India, Ltd.  GES is the primary U.S. distributor of small diameter graphite electrodes sourced from HEG.  Graphite India confirmed to GES, in May 2011, that it was not selling to Ameri-Source, but instead exclusively used a company called Graphite Sales to sell its small diameter graphite electrodes in the Unites States.

69.    In July 2011, Amstead, a GES client, informed GES that Ameri-Source had offered it some "HEG" electrodes.  However, GES exclusively represents HEG in the United States.  Immediately thereafter, Manish Gulati, HEG's general manager of international business, confirmed that HEG never sold electrodes to Ameri-Source and that any representation that Ameri-Source had imported electrodes from India through HEG was false.

70.    On October 15, 2011, HEG provided to GES a certified letter stating that it had never exported finished or unfinished graphite electrodes to Ameri-Source or any party working for Ameri-Source, signed by Manish Gulati, on behalf of HEG.

71.     On January 6, 2012, Graphite India's Senior Vice President of Marketing, A K Dutta, confirmed in an email that Graphite India had not supplied any material to Ameri-Source in the last 5 years, with the exception of 120 tons dispatched between January and March 2010.

72.     In early October 2011, GES employees visited McConway & Torley to discuss small diameter graphite electrode sales for 2012.  Over the year leading to this visit, McConway & Torley had purchased 50% of its small diameter graphite electrode requirements from GES and 50% from Ameri-Source.  During the visit a representative of McConway & Torley informed the GES employees that McConway & Torley would purchase 100% from Ameri-Source in 2012, as Ameri-Source was quoting Indian material at $1.95 per pound, a price at variance with normal pricing of approximately $2.25 to $2.40 per pound for Indian-sourced small diameter graphite electrodes.

73.     On November 22, 2011, a GES sales representative spoke to the Melt Shop Manager at Carpenter, a GES customer, who informed the GES representative that Ameri-Source approached him about the sale of material from India.  When the Melt Shop Manager pressed the Ameri-Source representative as to the specific manufacturer in India, the Ameri-Source representative claimed he could not remember.

74.     In early February 2012, a GES sales representative visited Akers, a GES customer, concerning 2012 electrode orders.  The purchasing manager at Akers informed him that an Ameri-Source representative recently quoted "Indian" electrodes at a price 25% less than GES or other U.S. suppliers.  In justifying Ameri-Source's lower price for "Indian" electrodes, the Ameri-Source representative misrepresented that Ameri-Source sourced electrodes from both HEG and Graphite India and "plays the two Indian suppliers off of each other" in order to get the low prices.  Ameri-Source's claim that it sources from HEG and Graphite India is directly

contradicted by HEG and Graphite India, who both, as previously noted, expressly disavow supplying Ameri-Source.

75.    Additionally, Ameri-Source did not have access to Indian materials at that time and did not represent either HEG or Graphite India in the United States, because each company has an exclusive representation agreement with GES and Graphite Sales, respectively.

76.    Further, in late August 2012, Ormet Aluminum ("Ormet") requested pricing for four-inch, graphite electrodes from GES. A representative of Ormet informed GES that Ormet was currently purchasing Indian, four-inch electrodes from Ameri-Source. Despite Ameri-Source's dubious representations that it sources its electrodes from HEG and Graphite India, neither HEG nor Graphite India, the only Indian manufacturers of graphite electrodes, produces four-inch electrodes.

77.    Collectively, all of the evidence: the shipping documents, Ameri-Source's dumping level pricing, the eyewitness accounts of Ameri-Source's facilities and material, and the representations of all of the Indian suppliers lead to the inescapable conclusion that Ameri-Source is sourcing material from China and misrepresenting the source of origin as India and intentionally identifying the goods with an incorrect HTS Code to avoid its obligation to pay antidumping tariffs.

**B.    There Are No Known South Korean Manufacturers of Synthetic Graphite**

78.    Import records show that Ameri-Source imports a significant quantity of graphite rods or electrodes into the United States from South Korea.

79.    There are no known manufacturers of synthetic graphite located within South Korea. Since the production of synthetic graphite requires expensive, highly advanced, specialized technology, producers would have to be partnered with one of a limited group of

global companies including SGL, Union Carbide, or a select few Japanese companies to even be capable of such production.  There are no known partnerships between any of these companies and a South Korean synthetic graphite manufacturer.

80.     It appears that the graphite rods and electrodes with "South Korean" origin actually originate from China.  Their importation is in direct violation of the Order.

## VI.     Ameri-Source's Scheme Damages the United States and Violates the Purpose of the Antidumping Law By Giving An Unfair Advantage Over Other Importers

81.     Upon arrival of its material into the United States, Ameri-Source provides the country-of-origin and HTS Code information necessary to complete and submit the required CBP Form 7501. Despite its obligation under 19 U.S.C. §1484 to use reasonable care in providing such information, Ameri-Source knowingly and falsely declared India to be the country-of-origin and HTS Code 3801.10.1000 to be the classification of graphite rods or electrodes that originated from China and were imported into the United States.

82.     By providing the false country-of-origin and HTS Code information, Ameri-Source made or caused to be made a false record or statement material to its obligation to pay money to the United States.  Furthermore, Ameri-Source continues to make or cause others to make additional false records or statements as it (i) continues to import new shipments of Chinese unfinished graphite electrodes into the United States under HTS Code classification 3801.10.1000, and (ii) continues to import new shipments of Chinese unfinished graphite electrodes into the United States falsely designating India to be the country of origin.

## COUNT ONE – VIOLATION OF 31 U.S.C. § 3729(a)(1)(G)

83.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

84.     Relator, as the original source of information regarding Defendants' violations of the FCA, had direct and independent knowledge of the information on which the allegations contained herein are based.

85.     As discussed above, China is the proper country-of-origin of the small diameter graphite electrodes that Ameri-Source has routed through Special Machining in India before importation into the United States.

86.     On or about the arrival date of each shipment of graphite rods or electrodes imported into the United States from Special Machining, and continuing with new imports of graphite rods or electrodes, Ameri-Source fraudulently claimed that the graphite rods or electrodes had a country-of-origin of India, rather than China.

87.     Furthermore, prior to or upon arrival of each shipment of graphite rods or electrodes imported into the United States from Special Machining, and continuing with new imports of graphite rods or electrodes, Ameri-Source fraudulently marked, and continues to fraudulently mark, the packaging as made in India, rather than China.

88.     At all times material to this Complaint, Ameri-Source either had actual knowledge of the falsity, acted in deliberate ignorance of the truth or falsity, or acted in reckless disregard of the truth or falsity of their records and statements regarding the proper country-of-origin for Chinese graphite rods or electrodes they imported into the United States.

89.     By falsely declaring India as the country-of-origin on the CBP Form 7501, Ameri-Source avoided, and continues to avoid, paying an antidumping duty of 132.90 to 159.64 percent that is required for imports of finished or unfinished small diameter graphite electrodes from China.

90.     Ameri-Source further owes penalties up to the domestic value of the goods in accordance with 171 C.F.R. Ch. 1, App. B, for falsely declaring India as the country-of-origin for imports of graphite rods or electrodes from China.

91.     Ameri-Source is also liable for additional duties of 10% of the appraised value of the goods in accordance with 19 C.F.R. Ch. 1, Subpart B, for falsely marking the graphite rod or electrode packaging as being made India, rather than China.

92.     Ameri-Source had, and continues to have, obligations to represent the proper country-of-origin and HTS Code on the customs forms, to pay the required antidumping duties, and to properly mark the packaging with the actual country-of-origin, as these obligations were established duties arising from statutes and regulations.

93.     Ameri-Source's aforementioned false country-of-origin and HTS Code designations have, and continue to have, a natural tendency to influence CBP to assess Ameri-Source a lower duty to import the graphite rods or electrodes, which actually originated in China, into the United States.

94.     By falsely declaring India as the country-of-origin for graphite rods and electrodes that actually originated from China, Ameri-Source made or caused to be made, and continues to make or cause to be made, a false record or statement material to their obligation to pay money to the United States.

95.     Furthermore, by falsely declaring India as the country-of-origin for the graphite rods or electrodes, Ameri-Source has knowingly concealed and knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States. Ameri-Source continues to import graphite rods and electrodes using this same pattern of false records, concealment, and avoidance.

96.     Ameri-Source's false records or statements, concealment, and avoidance violate 31 U.S.C. 3729.  Through its violations of 31 U.S.C. 3729, Ameri-Source has obtained entry and release, and continues to obtain entry and release, of its graphite rods or electrodes into the United States without paying amounts due to the United States.  Ameri-Source has knowingly or recklessly damaged the United States in an amount to be determined at trial.

## COUNT TWO – VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)

97.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

98.     Ameri-Source affiliates also acted, and continue to act, in concert to violate the FCA by knowingly concealing or knowingly and improperly avoiding or decreasing their obligation to pay or transmit money or property to the United States by failing to properly declare China as the country-of-origin or using an improper HTS Code for the graphite rods or electrodes they imported, and continue to import, into the United States.

99.     Ameri-Source committed, and continues to commit, the overt acts described in furtherance of the conspiracy, including but not limited to, stating a false country-of-origin or incorrect HTS Code on required customs forms, concealing and avoiding their obligation to pay antidumping duties, and fraudulently marking the graphite rod or electrode packaging with a false country-of-origin or incorrect HTS Code.

100.    Ameri-Source's conspiracy violates, and continues to violate, 31 U.S.C. § 3729(a)(1)(C), by which Ameri-Source obtained entry and release, and continue to obtain entry and release, of their graphite rods or electrodes into the United States without paying amounts due to the United States.  Ameri-Source has knowingly or recklessly damaged the United States in an amount to be determined at trial.

WHEREFORE, plaintiff prays for the following:

1.      An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq.* for Defendants' violations, and continuing violations, of 31 U.S.C. § 3729(a)(1)(G);

2.      An award of treble damages, civil penalties, expenses, fees, and costs against Defendants, jointly and severally, in accordance with 31 U.S.C. § 3729 *et seq.* for Defendants' violations, and continuing violations, of 31 U.S.C. § 3729(a)(1)(C);

3.      An award of a trial by jury on all issues so triable; and

4.      An award of such other and further relief, legal or equitable, which the Court deems just and proper.

Dated: _H / 1 /13_____

                                        Respectfully Submitted,

                                        _____
                                        John J. Myers
                                        Pa. I.D. No. 23596
                                        Scott D. Cessar
                                        Pa. I.D. No.  49639
                                        Eckert Seamans Cherin and Mellott, LLC
                                        44th Floor, 600 Grant Street
                                        Pittsburgh, Pennsylvania 15219
                                        412-566-6000

                                        Counsel for Plaintiff Relator, GES

**OF COUNSEL:**

                                        */s/ James F. Barger, Jr._____*
                                        James F. Barger, Jr.
                                        Henry I Frohsin
                                        J. Elliott Walthall
                                        Carrie M. Motes
                                        Frohsin & Barger, LLC
                                        3430 Independence Drive, Suite 40

Birmingham, Alabama 35209
Tel. (205) 933-4006
Fax (205) 933-4008

Counsel for Plaintiff/Relator, GES

## RELATOR DEMANDS A TRIAL BY STRUCK JURY

### Certificate of Service

On this the *1st* day of April, 2013, Relator hereby certifies that in compliance with Rule

4 of the Federal Rules of Civil Procedure, service of the *Qui Tam* Complaint has been executed

as follows:

**By Hand-Delivery to:**
United States Attorney David J. Hickton
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219


**By Certified Mail to:**
Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

OF COUNSEL

205.933.4006  |  FROHSIN & BARGER, LLC  |  frohsinbarger.com
3430 Independence Drive, Suite 40, Birmingham. AL 35209

31